ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
ROBIN L. GOLDFADEN (State Bar No. 208055)
MARISSA MALOUFF (State Bar No. 316046)
Supervising Deputy Attorneys General
REBEKAH A. FRETZ (State Bar No. 300478)
EZRA KAUTZ (State Bar No. 330352)
DENNIS OJOGHO (State Bar No. 346619)
THERESA ZHEN (State Bar No. 300710)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6063
E-mail: Theresa.Zhen@doj.ca.gov
*Attorneys for Plaintiff*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,<br><br>Defendants. | Case No. 2:26-cv-12026<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ACTION SEEKING STATEWIDE OR NATIONAL RELIEF** |

## INTRODUCTION

1. The administration of justice lies at the core of the States' police powers and is among the basic sovereign responsibilities and prerogatives retained by the States.

2. Every day, the State of California and the People of the State of California rely on the State's court system to vindicate rights, secure protection, and enforce the law.

3. Access to the courts is essential to the administration of justice and adherence to the rule of law and some of the most fundamental protections afforded by the Constitution, including the right to petition the Government for redress of grievances, the right to due process, and the rights of criminal defendants to a speedy and public trial, to be confronted with the witnesses against them, and to have compulsory process for obtaining witnesses in their favor. Full and equal access to the courts is critical to the fact-finding function of the judiciary, transparency for the public, the overall integrity of the judicial system, and our larger system of checks and balances.

4. Both the common law, dating back centuries, and California state law protect the sanctity of the courts, safeguard access to the courts, and preserve the integrity of judicial proceedings by barring civil arrests at courthouses.

5. For Defendants, this tradition and these laws apparently pose no obstacle. At Defendants' direction, federal agents have been carrying out civil immigration enforcement at state courthouses up and down the State of California, and they plainly have no intention of stopping. Just days ago, Defendants' leadership instructed agents nationwide to aim for 3,000 daily immigration arrests, with a target of 19,000 arrests per week. Defendants paired that quota with a directive to further target California, reportedly instructing their officers "to go after anybody" for a 45-day enforcement surge from San Diego to San Francisco. Dubbed "Operation Safe California," the operation is expected to last through

November, with officers cleared to "pick up anybody." And as California has already seen, Defendants view the State's courthouses as a convenient stomping ground.

6. Defendants' enforcement actions at California's courts are highly disruptive. They often involve use of force, and they are carried out in a manner highly visible to the public, with far-reaching impact. Criminal defendants, victims and other witnesses, parties to civil litigation, and survivors of domestic or family violence, among others who might wish to seek redress through the State's judicial system, have learned that courthouses are no longer safe places to appear. As a result, proceedings have been interrupted and delayed—and in some instances are altogether not pursued—and the State's ability to administer justice has been compromised.

7. Defendants' directives to conduct civil immigration enforcement at state courthouses—and their enforcement actions taken in accordance with those directives—violate the Administrative Procedure Act and contravene the Tenth Amendment. Defendants have engaged in agency decision-making that has lacked reasoning and has shown disregard for and even embrace of the substantial harm their actions visit upon the State.

8. Defendants have also knowingly acted in contravention of the law. The U.S. Supreme Court and lower federal and state courts have long recognized the common law privilege against civil arrests of those attending court—a privilege that rests on the principle that a judicial system cannot function if parties and witnesses alike fear that their appearance in court will result in civil arrest. When Congress authorized enforcement of civil immigration law, it did not disturb the centuries-old common law privilege and incorporated within the statute the common law's limitations.

9. Congress also conveyed no intent to disrupt the balance of federalism and intrude upon state sovereignty in the conduct of immigration

enforcement. And, further, Congress conveyed no intent to allow immigration authorities to disregard the Tenth Amendment. But Defendants' actions do all of this—causing substantial harm to the State.

10. By this Complaint, Plaintiff the State of California seeks to vindicate the State's interest in an untrammeled judicial system that is a full effectuation of the State's sovereign duty to administer justice and make its courts accessible to all of the State's residents, free from the interference of Defendants and the officers they have been deploying to courthouses across the State. The State of California accordingly seeks to have Defendants' directive to conduct civil immigration enforcement at state courthouses (and the resulting immigration enforcement at California's courts) declared unlawful, vacated, and enjoined.

## JURISDICTION AND VENUE

11. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

12. Venue is proper in this judicial district under 28 U.S.C. § 1391(e). Defendants are agencies of the United States and officers sued in their respective official capacities. The State of California is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within this district.

## PARTIES

13. Plaintiff the State of California is a sovereign State of the United States. California is represented by Attorney General Rob Bonta, who is the chief law officer of the State. The Attorney General has the duty "to see that the laws of the State are uniformly and adequately enforced," and is responsible for "direct supervision over every district attorney and sheriff . . . in all matters pertaining to the duties of their respective offices." Cal. Const., art. V, § 13. The Attorney General has the authority to file civil actions to protect California's rights and interests and the resources of this State. *Id.*; Cal. Gov. Code §§ 12510-11, 12600-

12; *see Pierce v. Superior Court*, 1 Cal.2d 759, 761-62 (1934) (The Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").

14. Defendant U.S. Immigration and Customs Enforcement ("ICE") is an agency within the Department of Homeland Security. ICE is responsible for the enforcement of federal immigration law. 8 C.F.R. § 100.1 (2025) (delegating authority to ICE "to administer and enforce certain provisions of the Immigration and Nationality Act and all other laws relating to immigration"). ICE, on May 27, 2025, issued a directive on civil immigration enforcement at or near courthouses. ICE agents and officers execute civil arrests in and around the courts of the State of California pursuant to that directive, which is challenged here, along with any further courthouse enforcement directive Defendants have since deployed.

15. Defendant David Venturella is the Acting Director and the Senior Official Performing the Duties of the Director of ICE. Defendant Venturella is responsible for establishing immigration enforcement policies and for overseeing the administration of those policies. 6 U.S.C. § 252(a)(3). Defendant Venturella has authority over all policies challenged in this litigation. Defendant Venturella is sued in his official capacity.

16. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). Among its functions, DHS is responsible for the administration and enforcement of the Nation's immigration laws. The agency's officers carry out enforcement activities under the authority of the agency and pursuant to policies and directives issued and approved by DHS.

17. Defendant Markwayne Mullin is the Secretary of Homeland Security and head of DHS. 6 U.S.C. § 112(a). The Secretary of Homeland Security

is "charged with the administration and enforcement of [the Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens," except where otherwise conferred on other officials. 8 U.S.C. § 1103(a)(1). "All authorities and functions of the Department of Homeland Security to administer and enforce the immigration laws are vested in the Secretary of Homeland Security." 8 C.F.R. § 2.1. Defendant Mullin is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I. California's State Court System

18. The California Constitution formally vests the "judicial power" of the State in the Supreme Court, Courts of Appeal, and Superior Courts. Cal. Const. art. VI § 1. In so doing, the Constitution lays the foundation for a single, unified court system for the State, which plays the vital role of promoting the rule of law and serving the public.

19. California has the largest court system in the Nation, serving the state's nearly 40 million residents. The state judiciary includes more than 2,000 elected trial court judges and subordinate judicial officers, approximately 500 court buildings, and more than five million cases filed in fiscal year 2024-25.

20. Each of the 58 counties in California has a superior court. Cal. Const. art. VI § 4. Superior courts have original jurisdiction over all civil cases (including family law, probate, juvenile, landlord/tenant, small claims, and other civil cases), all criminal cases (felonies, misdemeanors, and infractions, such as traffic tickets), and appeals of certain civil cases, misdemeanors, and infractions. *Id.* §§ 4, 10.

21. California's courthouses provide a range of self-help services and are a critical lifeline for people from all walks of life who seek justice—from victims of crime, to unpaid workers, to persons seeking restraining orders as protection from domestic violence or other threats to their safety.

22. California's court system and its courthouses, where the work of the State's judicial process is carried out, are essential to the orderly administration of justice, the peaceful resolution of disputes, and adherence to the rule of law.

23. In recognition of the unique role of the courts and the serious harms flowing from impeded access to the courts, California's Legislature passed Assembly Bill (AB) 668, which the Governor approved on October 12, 2019. AB 668 added Section 43.54(a) to the Civil Code, providing the statutory assurance that "[a] person shall not be subject to civil arrest in a courthouse while attending a court proceeding or having legal business in the courthouse." California's Legislature also passed Senate Bill 873, which the Governor approved on September 29, 2026. SB 873 expanded Section 43.54 of the Civil Code, providing that "[a] person shall not be subject to civil arrest while present at a courthouse for any lawful activity…[or] while traveling to or while traveling from a courthouse for any lawful activity."

24. AB 688 (2019) and SB 873 (2026) also expressly provided that Section 43.54 "does not narrow or in any way lessen any existing common law privilege." Cal. Civ. Code § 43.54(d).

25. The common law privilege against civil arrest at or en route to and from the courthouse dates back at least six centuries in England and was adopted early in the history of the United States. *See, e.g., Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation."); *Stewart v. Ramsay*, 242 U.S. 128, 130 (1916) (explaining that the privilege is held by the court); *Parker v. Marco*, 136 N.Y. 585, 589 (1893) (citing Year Book, 13 Hen. IV., 1 B among other sources); *Person v. Grier*, 66 N.Y. 124, 126 (1876) (discussing

cases); Simon Greenleaf, *A Treatise on the Law of Evidence* § 316, at 474 (Lawbook Exchange, Ltd. 2001) (16th ed. 1899) (footnote omitted) ("Witnesses as well as parties are protected from arrest while going to the place of trial, while attending there for the purpose of testifying in the cause, and while returning home, *eundo, morando, et redeundo*."); William Blackstone, *Commentaries on the Laws of England* 766 (1877) ("Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning."). This privilege is held by the courts as well as by litigants, witnesses, and others with matters before the courts.

## II. History and Overview of Defendants' Courthouse Enforcement Directives

26. Notwithstanding the centuries-old privilege against civil arrests at courthouses and federal and state statutes subsuming and reflecting this privilege, Defendants do not view themselves or their officers as limited in their authority to conduct enforcement. While courthouse immigration arrests were previously rare and exceptional, Defendants now routinely intrude on the State's courts without compunction.

27. As set forth below, a marked shift in Defendants' immigration enforcement at California courthouses occurred when Defendants launched a new directive in late May 2025. Although that May 2025 Directive was ordered vacated in late June 2026 in an unrelated proceeding, Defendants' enforcement actions at California's courts have continued.

28. Upon information and belief, the directive that has been deployed since the vacatur is, and has been, materially identical to the May 2025 Directive in that it has authorized officers to continue immigration enforcement activities at state courthouses in ways that cause harm to the State and its sovereign interests. Because Defendants' courthouse enforcement behavior has not materially changed

since the May 2025 Directive was vacated, the present complaint challenges Defendants' agency action of continuing to engage in civil immigration enforcement at state courthouses pursuant to the May 2025 Directive, the 2021 Directive, and the Directive deployed after vacatur. The present complaint collectively describes those directives as Defendants' "Courthouse Enforcement Directive."

**a. May 2025 Directive**

29. Defendants' most recently issued written directive, dated May 27, 2025, is Policy Number 11072.4, Civil Immigration Enforcement Actions in or Near Courthouses. Todd Lyons, Acting Director of the U.S. Immigration and Customs Enforcement, Policy Number 11072.4, "Civil Immigration Enforcement Actions in or Near Courthouses" (May 27, 2025). A copy of the directive, referred to herein as the "May 2025 Directive" is attached hereto as Exhibit A.

30. The May 2025 Directive authorized the civil immigration arrest of any noncitizen in or near a courthouse. It went so far as to assert that civil immigration enforcement actions are "often required" in jurisdictions that decline to grant immigration "detainer[]" requests.[1] Defendants thus determined they would seek to punish or coerce a different policy choice by targeting States like California for courthouse enforcement. California law prohibits law enforcement agencies, other than the Department of Corrections and Rehabilitation, from granting immigration detainer requests. Cal. Gov't. Code § 7284.6(a)(1)(B). Notably, however, federal immigration authorities have neglected to pick up one out of every eight people released from California's state prisons with immigration detainers

[1] Immigration detainers are requests to state or local law enforcement agencies to maintain custody of a person past the point when they would otherwise be released. Granting such requests is purely voluntary and can lead to legal liability. *See, e.g.*, 8 C.F.R. § 287.7 ("The detainer is a request…."); *Gonzalez v. U.S. Immigration and Customs Enforcement*, 975 F.3d 788, 804 (9th Cir. 2020); *City and County of San Francisco v. Trump* 897 F.3d 1225, 1241 n.7 (9th Cir. 2018) ("compliance with a [detainer] request is voluntary"); *Galarza v. Szalczyk*, 745 F.3d 634, 640-45 (3d Cir. 2014).

placed on them, and California's Department of Corrections and Rehabilitation has coordinated the transfer of more than 11,000 individuals from state custody to ICE custody since 2019.

31. The May 2025 Directive authorized various types of enforcement activities at courthouses, including actions against "[n]ational security or public safety threats; [s]pecific [noncitizens] with criminal convictions; [g]ang members; [noncitizens] who have been ordered removed from the United States but have failed to depart; and/or [noncitizens] who have re-entered the country illegally after being removed." But the May 2025 Directive nowhere limited authorized arrests to the listed categories of noncitizens.

32. Indeed, Defendants' May 2025 Directive made clear that federal agents could arrest anyone. In contrast to prior agency directives,[2] the May 2025 Directive specifically authorized enforcement against "family members or friends accompanying the target [noncitizen] to court appearances or serving as a witness in a proceeding." Such arrests were authorized to be made "on a case-by-case basis considering the totality of the circumstances," but the May 2025 Directive imposed no constraints and provided no guidelines or factors to consider.

---

[2] *See, e.g.*, John Morton, Director of U.S. Immigration and Customs Enforcement, Policy No. 10076.1, "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs" (Jun. 17, 2011) (instructing agents to "exercise all appropriate prosecutorial discretion to minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice); Philip T. Miller, Assistant Director for Field Operations, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, "Enforcement Actions at or Near Courthouses" (Mar. 19, 2014) (arrests reserved for "specific, targeted" individuals and expressly prohibiting the arrest of "collaterally" present individuals); Thomas D. Homan, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement, Policy Number 11072.1, "Civil Immigration Enforcement Actions Inside Courthouses" (Jan. 10, 2018) (noting that individuals "will not be subject to civil immigration enforcement action, absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions").

**b. January 2025 Directive**

33. Before the May 2025 Directive was issued, the agency issued an "interim" directive on the same topic on January 20, 2025. Caleb Vitello, Acting Director of U.S. Immigration and Customs Enforcement, Policy Number 11072.3, "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" (Jan. 20, 2025). That directive, referred to herein as the "January 2025 Directive," is attached hereto as Exhibit B.

34. The May 2025 Directive was identical to the January 2025 Directive in most material respects, but with a notable exception. The main exception was that the January 2025 Directive provided that ICE officers and agents could only conduct civil immigration enforcement actions at or near courthouses "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." The January 2025 Directive relatedly provided that ICE officers and agents "must coordinate with the relevant local Office of the Principal Legal Advisor (OPLA) office before conducting enforcement actions in or near courthouses to determine whether jurisdiction-specific legal limitations apply." The May 2025 Directive reversed course and eliminated—without acknowledgement or explanation—both of these provisions.

**c. 2021 Directive**

35. The January 2025 Directive rescinded the prior agency directive regarding civil enforcement at courthouses, as set forth in an April 27, 2021 joint memorandum of ICE and U.S. Customs and Border Protection ("CBP"). Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021). A copy of the rescinded directive, referred to herein as the "2021 Directive," is attached hereto as Exhibit C.

36. The 2021 Directive superseded and revoked ICE Directive 11072.1, issued on January 30, 2018, and entitled "Civil Immigration Enforcement Inside Courthouses." Multiple district courts ruled that the 2018 Directive contravened long-standing federal and state common-law privileges against courthouse arrests, but the 2021 rescission and replacement brought an end to those cases before the claims they raised reached final adjudication.

37. The 2021 Directive, while described as providing interim guidance, remained in place until Defendants rescinded it in January 2025.

38. The 2021 Directive began with the enunciation of a "core principle"; namely, that "[t]he courthouse is a place where the law is interpreted, applied, and justice is to be done," and "law enforcement officers and public servants" "have a special responsibility to ensure that access to the courthouse—and therefore access to justice, safety for crime victims, and equal protection under the law—is preserved." The 2021 Directive recognized that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice," and it described itself as setting forth guidelines to avoid "unnecessarily imping[ing] upon the core principle of preserving access to justice."

39. The 2021 Directive set forth what it labeled as "[l]imited [c]ircumstances in which courthouse enforcement would be allowed. Officers and agents were permitted to conduct "civil immigration enforcement action . . . in or near a courthouse" only in extremely limited circumstances—when the target posed "a national security threat," "an imminent risk of death, violence, or physical harm to any person," the "hot pursuit of an individual who poses a threat to public safety," or the "imminent risk of destruction of evidence material to a criminal case." The 2021 Directive also provided that "[i]n the absence of hot pursuit," a civil immigration enforcement action could also "be taken in or near a courthouse against an individual who pose[d] a threat to public safety" and it was necessary to

take the action in or near the courthouse "because a safe alternative location for such action does not exist or [it] would be too difficult to achieve the enforcement action at such location." Such an action had to be approved in advance by a field office director, special agent in charge, chief patrol agent, or post director.

40. In the formulation of the 2021 Directive, the May 2025 Directive, and the current Courthouse Enforcement Directive, Defendants failed to give due consideration to the substantial harms that immigration enforcement visits upon the State when conducted at its courthouses.

41. While the 2021 Directive rejected the far more intrusive 2018 Directive, it remained legally flawed in several respects. The 2021 Directive was flawed in, for example, presuming the availability of court personnel and other court resources to facilitate enforcement activity. (In practice, however, there was, on information and belief, exceptionally little immigration enforcement action taken at state courthouses from the inception of that directive to when Defendants rescinded it.)

42. The January 2025 Directive, among other changes, did away with the limiting principles set forth in the 2021 Directive, specifically authorizing the arrest of witnesses, family members, and bystanders. The May 2025 Directive made matters far worse. It carried forward that elimination of any limiting principles *and* it eliminated the prohibition on carrying out courthouse enforcement in jurisdictions that bar civil arrests at courthouses. In adopting these directives, Defendants did not acknowledge or explain their departures from prior directives

43. Defendants' May 2025 Directive and now their Courthouse Enforcement Directive have been causing substantial harm to Plaintiff. Other than under the first and current Trump administrations, the State, courts, prosecutors, defense counsel, parties to litigation, witnesses, and members of the public more broadly could count on state court proceedings to go forward without the sudden interruption of civil arrests or the threat thereof. But ever since Defendants issued

the May 2025 Directive, attorneys in California can no longer assure clients, witnesses, victims, and other interested parties that they can access the courts and participate in proceedings free from an unexpected civil arrest. Attorneys, judges, and other court personnel are now faced with disruptions, delays, and other harms to proceedings as a result of Defendants' directives and the arrests carried out under Defendants' direction.

**d. Vacatur of the January and May 2025 Directives, and the Promulgation of the Subsequent Courthouse Enforcement Directive**

44. In a decision issued on June 23, 2026, a federal district court held that the January and May 2025 Directives were arbitrary and capricious and thus violated the Administrative Procedure Act. *Pablo Sequen, et al. v. Albarran, et al.*, 835 F. Supp. 3d 1061, 1114-15, 1131 (N.D. Cal. 2026) ("*Pablo Sequen*"). The court therefore vacated the January and May 2025 Directives in full. *Id.* The court entered judgment on June 30, 2026, after the plaintiff class in that case sought enforcement of the court's June 23, 2026 order. Order Re: Stipulation for Entry of Judgment; And Judgment Under Rule 54(b), *Pablo Sequen,* No. 25-cv-06487-PCP (N.D. Cal. June 30, 2026), ECF No. 212. The court, on July 10, 2026, subsequently denied Defendants' request for a stay pending appeal. Order Denying Mot. for Stay Pending Appeal, *Pablo Sequen*, No. 25-cv-06487-PCP (N.D. Cal. July 10, 2026), ECF 217.

45. Defendants in *Pablo Sequen* then filed an appeal and thereafter requested a stay from the U.S. Court of Appeals for the Ninth Circuit. Motion to Stay Lower Court or Agency Proceedings/Order/Judgement, *Garcia, et al. v. Kaiser, et al.*, No. 26-4310 (9th Cir. July 14, 2026), ECF 8. Both the appeal and the motion for a stay remain pending before that court, and thus there is not yet a conclusive outcome in that case.

46. Subsequently, another federal district court found that the January and May 2025 Directives were arbitrary and capricious and thus violated the Administrative Procedure Act. *African Communities Together v. Venturella,* No. 25-cv-6366 (PKC), 2026 WL 2949409 (S.D.N.Y. Sept. 30, 2026). That court vacated in part and set aside the January 2025 Directive and the May 2025 Directive to the extent they purported to rescind the 2021 Directive as applied to civil enforcement actions in or near immigration courts. *Id.*

47. The vacatur of the January and May 2025 Directives did not change Defendants' approach to civil immigration arrests at California courthouses. Instead, as set forth below, Defendants have continued to conduct immigration enforcement activities at state courthouses pursuant to their present and operative Courthouse Enforcement Directive, which—upon information and belief—is materially and effectively identical to the vacated May 2025 Directive in that it authorizes continued civil immigration enforcement activities at state courthouses in ways that cause harm to the State and its sovereign interests.

## III. CIVIL IMMIGRATION ENFORCEMENT AT COURTHOUSES ESCALATES FOLLOWING DEFENDANTS' ISSUANCE OF THE MAY 2025 DIRECTIVE

48. Once the May 2025 Directive issued, Defendants' enforcement at California courthouses escalated, and it has not stopped. Defendants' officers and agents have been carrying out arrests and other enforcement actions in or near courthouses across the State, from the largest urban centers, such as Los Angeles and San Diego, to rural courthouses in Shasta, Butte, and Glenn Counties.

49. Defendants' May 2025 Directive and subsequent enforcement activities have had substantial impacts on state courthouses. Plaintiff compared available data about reported immigration arrests at state courthouses from two periods—the period between late January 2025 and the end of May 2025 (*i.e.*, the period when the January 2025 Directive withheld authorization to make civil arrests at courthouses in States like California); and the period since Defendants issued the

May 2025 Directive (*i.e.*, the period when that restriction on civil arrests was removed). Comparing the available data from those two time periods showed that—in the year following the issuance of the May 2025 Directive—the average monthly number of reported immigration arrests at California state courthouses increased by more than 550%. As complete data is not available for this time period, there is good reason to believe the actual increase was likely significantly higher.

50. More robust data collection began on June 1, 2026, pursuant to a new court rule, Cal. Rule of Court 10.440, which requires all superior courts to report specific data on civil arrests occurring inside court facilities to the Judicial Council of California. The data shows that in the month of June 2026, there were 34 incidents reported at superior courts statewide, resulting in 30 civil arrests, which on information and belief, were all conducted by federal law enforcement officers under the direction and supervision of Defendants.

51. Following the district court's order vacating the January and May 2025 Directives and entry of judgment in *Pablo Sequen*, in the months of July, August, and September 2026, there were at least 60 reported immigration enforcement incidents at superior courts statewide, resulting in 60 civil arrests. On information and belief, moreover, these numbers understate the presence and impact of Defendants' officers, as it has been reported that immigration officers frequent courthouses on a near-daily basis and then depart if and when they do not succeed in identifying a target.

52. Indeed, there have been numerous incidents of immigration enforcement actions in or around superior courts across California. Counties with courthouses that have been hit with Defendants' immigration enforcement actions include Alameda, Butte, Glenn, Fresno, Kern, Kings, Los Angeles, Madera, Marin, Merced, Orange, Riverside, Sacramento, San Bernardino, San Diego, Santa Barbara, Santa Clara, Shasta, Stanislaus, Tehama, Tulare, and Ventura. This list

includes the five largest counties in California, all of which have a significant percentage of noncitizen residents and families of mixed immigration status.

53. Federal officers have conducted civil immigration enforcement inside, on the grounds of, or close to state courthouses. Immigration agents routinely surveil courthouses and arrest noncitizens at state courthouses where criminal and non-criminal matters are heard, and where a variety of other civic business is conducted. Even if they do not effectuate a civil arrest, officers have a regular presence inside or near courthouses and have been spotted searching for individuals to arrest in hallways, security lines, courtrooms, and other areas where people perform their court business.

54. The enforcement actions are conducted unannounced, often by unidentified, plain-clothes officers. Defendants' officers often identify a target and then apprehend them in the hallway, lobby, parking lot, or outside the courthouse. Sometimes they follow their target from the courtroom; other times they apprehend the individual before they reach the courtroom. They have also been observed demanding identification from individuals accompanying the person appearing in court, creating an atmosphere of fear and threat of arrest. In some instances, Defendants' officers have tailed court attendees from their court hearings for a short distance and then arrested them.

55. While California has made clear that it does not authorize its courthouses or related property or resources to be used for immigration enforcement or other civil arrests, federal officers have, among other tactics, unilaterally appropriated courthouse facilities and courthouse parking lots as staging and enforcement areas, including to chase down members of the public and load and transport persons arrested for immigration enforcement purposes. Defendants' officers have been reported to wait in the court parking lot in certain counties for days on end, seeking to apprehend individuals who are coming to or from the courthouse.

56. On information and belief, Defendants use state court systems, processes, and proceedings to identify and catch those suspected or targeted for investigation of a civil immigration violation. In some instances, agents sit inside courtrooms to monitor court proceedings and determine from their observations which court attendees they will pursue for arrest; immigration agents also run the names of their targets through the court's online public records and then use that information to make arrests of those targets on the date of scheduled court appearances; immigration agents, at other times, utilize electronic case information posted in front of each courtroom, which includes the name of the defendant and the case number, to identify arrest targets.

57. When civil immigration arrests occur in or near a courthouse, the incidents often involve a spectacle that intimidates and shocks bystanders and arrestees alike. The following are illustrative, but hardly exclusive, examples.

58. In Los Angeles County, ICE arrested two women on June 24, 2025, outside the Airport Courthouse, where the women were scheduled to appear for an early disposition hearing on a criminal matter. Federal agents waited for them outside a third-floor courtroom and followed them out of the courthouse, handcuffed them, put them in a black unmarked SUV, and drove away. There was widely circulated video of the incident.[3]

59. In a separate incident in Los Angeles County, a person was arrested in front of a Los Angeles County criminal courthouse after attending a preliminary hearing on August 14, 2025. A video of the arrest, circulated on social media, showed the man screaming for help as immigration agents picked him up by his arms and legs before placing him in an unmarked car.

[3] James Queally, "ICE arrests at L.A. courthouse met with alarm: 'Absolutely blindsided,'" LA Times (June 25, 2025), https://www.latimes.com/california/story/2025-06-25/ice-arrests-los-angeles-courthouse.

60. In Stanislaus County, ICE officers entered the Stanislaus County Courthouse on July 1, 2025, and arrested a person inside. After that courthouse arrest, community members reportedly were afraid to attend hearings or seek victim protection services.

61. Since then, on July 31, 2026, two plain-clothed immigration officers cornered a man and a woman holding a baby at a stairwell in the Stanislaus County Courthouse. Bystanders heard screaming and saw the officers engaged in a physical altercation that required the intervention of local law enforcement, who upon realizing the officers were ICE agents, asked them to stop and pleaded that this was "not the way to handle the situation." The ICE agents then dragged the individuals down the stairs while the woman still had the baby in her arms. In that process, one of the agents took out his taser and made indications that he would tase the woman with the baby in her arms, when a court security officer removed the baby to mitigate the risk of injury to the child.

62. In Butte County, federal officers conducted a day-long immigration enforcement action at the Oroville Courthouse on July 28, 2025, during which at least six litigants were taken by those officers immediately after their court proceedings. Thereafter, court users expressed concern and hesitation about coming to court. Immigration enforcement has been conducted in Butte County as recently as June 2026.

63. Federal immigration enforcement officers reportedly arrested at least 33 individuals in or near the San Bernardino County Superior Court between October 2025 and April 2026.[4]

64. These arrests have often been accompanied by violent and intimidating tactics. For example, in July 2025, a man was leaving the San

[4] Hannah Fry, "ICE detains three men outside SoCal courthouse, raising concerns for local immigration advocates," LA Times (Apr. 10, 2026), https://www.latimes.com/california/story/2026-04-10/ice-detainment-socal-courthouse.

Bernadino Superior Court in Rancho Cucamonga after a court hearing when multiple armed federal officers surrounded him and his pregnant girlfriend in unmarked vehicles, held him at gunpoint, and broke his car window with a baton to overwhelm him with force.

65. In another instance, in December 2025, in full view of the public, armed men wearing masks and tactical vests carried a man by his arms and legs out of the Rancho Cucamonga courthouse, and into an unmarked SUV. Video of the incident circulated widely on social media.

66. On other days at the San Bernardino courts, members of the public or the media have video recorded and reported on other enforcement incidents, which have included individuals being surrounded and handcuffed by swarms of officers in front of onlookers.

67. On information and belief, while the arresting officers in many courthouse enforcement incidents were not identifiable, each of these arrests was a civil immigration enforcement action. DHS officers have had a widespread practice of carrying out civil immigration enforcement in masks and plain clothes that hide their identity and law enforcement agency, and these arrests were in line with that practice.

68. In Fresno, ICE agents have arrested more than 43 people at the county courthouse since June 2025. Some of those arrested were awaiting trial and had not been convicted of any crime. During one encounter, ICE agents entered a courtroom before a court session, checking and taking a photograph of the sign-in sheet, and then calling out a person’s name. In another encounter in October 2026, four federal agents tackled a noncitizen to the ground and handcuffed him at a Fresno courthouse. Enforcement actions like these cause disruptions in the court’s calendar, intimidate litigants and witnesses, and hamper court operations.

69. The arrests made by Defendants’ officers have been characterized by verbally and physically aggressive tactics toward arrestees and their attorneys.

For example, in Shasta County, where federal agents have made at least 34 arrests at the state courthouse since January 2025, one arresting federal officer, upon detaining a noncitizen in the courthouse hallway, retorted that he did not "fucking care" when the attorney with the person being arrested indicated she was the individual's defense attorney, refused to produce a warrant, and blocked her attempts to speak to her client to obtain contact information to notify family or friends about his arrest. As another example, in Fresno, federal agents physically pushed a public defender after he identified himself as a noncitizen's attorney and asked to see a warrant.

70. As immigration arrests and encounters like those described here have continued in and around courthouses in California, the harmful impact on the state judicial system is substantial.

71. The Courthouse Enforcement Directive's implementation continues to impede access to the courts and the operation of the judicial system. As described above, although a federal court in *Pablo Sequen* has vacated the January and May 2025 Directives, Defendants have continued their civil immigration enforcement activities at courthouses throughout the State.

## IV. Defendants' Enforcement Actions at Courts Pursuant to the Courthouse Enforcement Directive Disrupt California's Ability to Administer a Fair and Orderly System of Justice

72. Defendants' actions have caused serious disruption and have had a profound chilling effect, to the detriment of Plaintiff.

73. As Defendants' enforcement actions snowballed and word of those actions at courthouses spread, the harms were also amplified, and they remain substantial. Many California residents refuse to access or attend California state court proceedings for fear of civil arrest and detention or concern about potential impacts on loved ones or simply because they do not want to risk exposure to enforcement incidents that can be traumatic and frightening. As one example, in October 2026, a California resident went to the Fresno County Superior Court for a

scheduled court appearance and upon seeing four ICE officers at the courthouse entrance, became fearful and left instead of attending his court proceeding that day. The arrest of criminal defendants or other parties to litigation, and the chilling effect on those who fear civil arrests in or near courthouses, causes delay, altogether halts some proceedings, and has an outsized impact on how matters do or do not resolve.

74. Civil plaintiffs, criminal defendants, crime victims, prosecutors, defense attorneys, protective services for persons fleeing domestic violence, civil legal aid providers, courthouse security, court interpreters and other court staff, law enforcement, members of the public, and the system as a whole are all adversely affected by the Defendants' unlawful actions.

75. In deterring victims, witnesses, and parties from accessing state courts, Defendants have disrupted California state courts' ability to provide access to justice.

76. Of particular concern, victims of crimes have declined to come to court or otherwise participate in the judicial process because they are afraid of being subjected to an immigration arrest at the courthouse. Without the cooperation from residents who are witnesses or victims of crime and are immigrants or otherwise fear immigration enforcement at court, prosecutors face the risk of having to drop or reduce charges or dismiss cases. This frustrates California's ability to enforce its laws and secure justice for crime victims.

77. The following examples are illustrative:

- In a Los Angeles case involving a defendant who allegedly had fired at fleeing victims, with one bullet striking and injuring one victim, the victims were undocumented and refused to come to court for fear of being arrested and deported by ICE. As a result, the attempted murder charges and assault charges were dismissed.

- In another case involving residential burglary, the victim, who had been at home at the time, was afraid to come to court for fear of arrest and deportation. Because of the victim's reluctance, the Los Angeles County District Attorney's office was forced to resolve the case for no additional jail time for the defendant.
- In a criminal case involving wage theft, prosecuted by the California Attorney General's Office, several victims refused to appear in court, putting the claims on their behalf at risk of dismissal and compromising the ability of the Attorney General's Office to fully press the case and secure complete relief against the employer charged with violating the law.
- In a Santa Clara case involving felony assault charges, the victim was afraid to testify at trial due to fear of ICE enforcement at the courthouse. As a result, he did not appear in court for trial, and the State was forced to resolve the case for a lesser charge.

78. Interference with the ability of state and local prosecutors to prosecute perpetrators and other dangerous individuals jeopardizes public safety across California. When fear of civil arrest deters a witness to a crime from testifying, the court is deprived of key evidence that could help determine guilt or innocence. If, as a result, a guilty defendant is released or an innocent defendant gets convicted, the public at large is less safe and justice less certain.

79. When criminal defendants are arrested at court, the outcome is no better. Prosecutors are unable to provide justice to the victims of the crime or to the people of the State when immigration officers arrest and remove a criminal defendant from the jurisdiction of the state court before prosecution is complete or before a sentence is served.

80. By making victims and witnesses afraid to come forward to report and testify about crimes and otherwise impairing prosecutors' ability to obtain

justice, Defendants' immigration enforcement activities at state courthouses thwart prosecutors in their charge to enforce the law uniformly and without regard for the immigration status of victims.

81. Similarly, defense attorneys are caught between their clients' legitimate fears of a courthouse immigration arrest and resolving their cases. Many criminal defendants, including those with no prior criminal convictions, face an impossible quandary. While they are entitled to their day in court, they risk arrest by immigration officers when they do appear. Defense attorneys have tried to appear on their clients' behalf or to negotiate with the court for waivers of appearance to avoid risking an immigration arrest. However, non-appearances tend to delay resolution of the matter, delay or halt the fact-finding process, impede plea negotiations, and lead to further delays and more hearings that siphon resources from attorneys and the courts.

82. Litigants and witnesses are increasingly requesting to appear remotely for court hearings due to fear of immigration enforcement at courthouses. However, the option for remote hearings is not always available as judges may require in-person witness testimony for a variety of reasons, including, but not limited to, its perceived effectiveness in gauging the credibility of critical witnesses. If denied the opportunity to attend remotely, people are deciding not to appear at hearings at all out of fear, even when doing so means forfeiting fundamental rights or access to just results in given cases. When parties and witnesses fail to come to court, meritorious cases are not filed or result in continued or abandoned proceedings.

83. Defendants' enforcement at courthouses has led to disruptions to orderly court operations; interfered with the timely resolution of criminal prosecutions; and placed a heavy burden on court officers and court personnel to maintain order, decorum, and the safety of court users when there is immigration enforcement in or near courthouses. Court staff have also been frustrated in their

ability to provide a safe and neutral forum where all individuals regardless of immigration status can resolve legal matters and access essential court services.

84. Judges, prosecutors, public defenders, court reporters, interpreters, and security personnel waste their time and resources preparing for hearings and trials that do not occur when defendants are detained in the middle of their case or refuse to appear for fear of courthouse arrest. Prosecutors additionally waste their time investigating cases and charging crimes.

85. From a judicial administration standpoint, courthouse resources are wasted when participants do not show up. The court typically issues a bench warrant when a person does not appear for a criminal court proceeding. However, issuing bench warrants for failing to appear only creates more criminal cases and administrative work for judges, prosecutors, and defense attorneys, and sends more people to jail if they are released from immigration detention and then arrested on the bench warrant. All of this exacerbates the waste of state resources.

86. Defendants' enforcement at courthouses has also subverted the efforts of California's judicial officers, prosecutors, and defense attorneys to resolve criminal matters. In one instance in Glenn County, ICE agents arrested someone while he was entering the courthouse for his hearing. The ICE agent requested that a court officer conceal the arrest from the judge, so that the court would issue a warrant for failure to appear and the warrant would be active if the person re-entered the country.

87. The impact of Defendants' civil immigration arrests in or near courthouses extends beyond criminal court and has led to serious disruptions in civil and family court matters.

88. In housing cases, for example, tenants have been defaulting on evictions rather than risking coming to court, even where they have had valid claims or defenses. Ultimately, this results in avoidable displacement, loss of housing, harm to families and communities, and further drain of public resources.

89. In cases involving domestic violence restraining orders or abused elder or dependent adult restraining orders, the restraining order is routinely denied when the applicant does not appear in court to testify, with consequent impacts to public safety where there is threatened or ongoing abuse, but fear of immigration enforcement has dissuaded the victim from testifying. A non-appearance can also impact one's ability to obtain other types of relief, including child custody, child support, or mediation.

90. Government agencies and non-profits that serve crime victims are also impacted by Defendants' May 2025 Directive and current Courthouse Enforcement Directive. Such organizations report that they are now receiving calls about noncitizens who have been arrested at the courthouse or from noncitizens concerned about appearing in court to attend hearings in civil matters or obtain court services.

91. In Stanislaus County, for example, undocumented victims and witnesses hesitate to report crimes or participate in court proceedings because of fears concerning Defendants' officers and agents making arrests at courthouses. In one instance, a noncitizen client sought a restraining order but was afraid to file for it after hearing stories of ICE detaining people in court.[5]

92. Similarly, the Legal Aid Association of California (LAAC), a state-funded nonprofit agency that advocates for increased capacity of the civil legal aid system to address ongoing needs of low-income residents, reports that the effectiveness of legal aid has been diminished by the current and threatened federal immigration enforcement activities at or near courthouses. As reported to LAAC, legal aid attorneys are hearing that their clients are reticent to seek recourse through the civil justice system and fear being arrested by immigration officers at the courthouse.

---

[5] Julietta Bisharyan, "Fears of deportation are silencing crime victims in Stanislaus County," The Modesto Bee (August 28, 2025), https://www.modbee.com/news/local/article311886762.html#storylink=cpy.

93. When residents of the State are not able to pursue vindication of their rights in court—such as the right to safe housing and payment of wages owed—the State is injured.

94. Enforcement at courthouses also harms the State's law enforcement interests. Community advocates report that the fear of being arrested at a courthouse is so great that noncitizens are discouraged from reporting crimes in the first instance. Less reporting of crime heightens the risk that crime grows, increases the risk of exploitation, particularly in immigrant communities, and diminishes overall public safety. Defendants here are undoing the years of work that California has undertaken to strengthen trust in law enforcement and build community ties.

## V. California Has Not Consented to the Use of Its Court Resources for Civil Immigration Arrests

95. California has made clear through its state laws and policies that it does not consent to civil immigration arrests at its state courthouses.

96. As noted above, in addition to the protection of the courts and court proceedings provided by the common law, state law prohibits civil arrests in a courthouse while attending a court proceeding or having legal business in the courthouse, absent a valid judicial warrant. *See* Cal. Civ. Code § 43.54.

97. California officials more broadly have publicly denounced civil immigration courthouse arrests.

a. In July 2025, the Chief Justice of the California Supreme Court responded to the increase in civil immigration arrests at courthouses: "I am deeply concerned about reports of multiple federal immigration enforcement actions at California courthouses and their potential chilling effect — as I would be regarding any barrier to access to the courts. . . . Making courthouses a focus of immigration enforcement hinders, rather than helps, the administration of justice by deterring witnesses and victims from

coming forward and discouraging individuals from asserting their rights."[6]

b. Presiding Judge Sergio C. Tapia II of the Los Angeles County Superior Court expressed similar concerns after the arrest of two individuals at a Los Angeles courthouse: "These intimidating and unnecessary displays undermine public trust in the justice system, deter people from seeking justice, and send a dangerous message to immigrant communities that they are not safe to fully and freely participate in the legal process."[7]

c. After an arrest by federal officers at the Los Angeles County Superior Court, the Los Angeles District Attorney's Office issued a statement: "Detaining a defendant before the judicial process has concluded interferes with our ability to prosecute cases and is not to the advantage of the pursuit of justice."[8]

d. County of Santa Clara District Attorney Jeffrey Rosen has similarly stated that the "pursuit of justice" through the investigation and prosecution of criminal cases "is improved when people do not fear that their participation in a criminal prosecution will lead to deportation or other adverse immigration consequences."[9]

---

[6] Cathal Conneely, "California Chief Justice Issues Statement on Immigration Enforcement at California Courthouses," California Courts Newsroom (Jul 31, 2025), https://newsroom.courts.ca.gov/news/california-chief-justice-issues-statement-immigration-enforcement-california-courthouses.

[7] Chris Boyette, "Man yells for help as ICE agents carry him from LA courthouse into unmarked car, video shows," CNN (Aug 15, 2025), https://www.cnn.com/2025/08/15/us/los-angeles-courthouse-ice-detention.

[8] Laurie Perez, "LA County judge denounces ICE arrest outside downtown courthouse," CBS News (August 13, 2025), https://www.cbsnews.com/losangeles/news/la-county-judge-denounces-ice-arrest-outside-downtown-courthouse/.

[9] *Santa Clara v. Trump*, Case No. 17-CV-00574, ECF. No. 33 ¶ 4, Declaration of Santa Clara County District Attorney Jeffrey F. Rosen (N.D. Cal. Feb. 23, 2017).

e. Stanislaus County Presiding Judge Sonny S. Sandhu has stated: "Federal immigration enforcement activities inside courthouses disrupt court operations, breach public trust, and compromise the Court's constitutional role as a neutral venue for the peaceful resolution of disputes. These actions create a chilling effect, silencing victims, deterring witnesses, discouraging community members from seeking protection and deterring parties from participating in legal proceedings critical to the rule of law."[10]

98. The Legislature of the State of California has codified findings in Cal. Civ. Code § 43.54 that reflect these observations.

99. Indeed, stakeholders at all levels recognize that trust in California's court system by immigrant communities is being lost. The loss of trust in California's justice system is a devastating harm for the state court system.

100. Defendants' May 2025 Directive, their current Courthouse Enforcement Directive, and the immigration enforcement carried out at state courthouses under those directives continue to deter noncitizens and citizens alike from participating in the judicial process. California courts, like all courts, rely on parties and witnesses to file and attend proceedings. Courthouse arrests have interfered and continue to interfere with California courts' basic functioning.

101. For all these reasons, California now brings suit to vindicate its sovereign right to operate its court system free from unlawful and unconstitutional interference.

---

[10] Press Release, "Court Responds to ICE Activity at the Stanislaus County Courthouse," Superior Court of the State of California, County of Stanislaus (July 2, 2025), https://www.stanislaus.courts.ca.gov/news/court-responds-ice-activity-stanislaus-county-courthouse.

# CLAIMS

## FIRST CAUSE OF ACTION

### Administrative Procedure Act—Arbitrary and Capricious

### 5 U.S.C. § 706(2)(A)

102. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

103. The Courthouse Enforcement Directive is a "final agency action." 5 U.S.C. §§ 551(13), 704.

104. The Courthouse Enforcement Directive is arbitrary and capricious because Defendants failed to engage in reasoned decision-making and failed to articulate a satisfactory explanation for their action.

105. Defendants considered inappropriate factors in making their decision and relied on factors that are not supported by substantial evidence.

106. Defendants failed to consider important aspects of the problem.

107. The Courthouse Enforcement Directive has predictably resulted in negative consequences to the public and to Plaintiff, including, but not limited to, impairing the State's ability to operate its judicial system, ensure access to justice, prosecute violations of state criminal law, and vindicate the rights of the State and the People of the State of California.

108. Defendants failed to acknowledge or provide a reasoned explanation for departures from past agency actions, failed to consider the harms that would result from their action, and also failed to consider reliance interests as they pertain to the State's maintenance and operation of a judicial system and enforcement of its own legal code.

109. Accordingly, Plaintiff is entitled to an order and judgment, holding unlawful, vacating, and setting aside the Courthouse Enforcement Directive and enjoining any action taken to enforce or implement it.

**SECOND CAUSE OF ACTION**

**Administrative Procedure Act—Exceeds Statutory Authority**

**5 U.S.C. § 706(2)(C)**

110. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

111. There exists a longstanding common law privilege against civil arrest of witnesses, parties, and others attending court on official business. The privilege protects both the person and the place (i.e., courthouses and their environs).

112. When Congress authorized immigration enforcement, it did so against the backdrop of this longstanding common law privilege forbidding civil arrests at or when on route to and from a courthouse.

113. Congress did not displace or abrogate the common law privilege when it enacted the INA and conveyed authority for immigration officers to carry out enforcement of civil immigration law. *See* 8 U.S.C. §§ 1226(a), 1357(a). Rather, the statute incorporates the privilege. Thus, the power Congress granted to immigration officers to conduct civil arrests is subject to the limitations that the common law has for centuries imposed on the effectuation of civil arrests.

114. Congress, in enacting the INA and authorizing civil immigration law enforcement, also did not convey any intent to preempt the historic powers of the States. The courthouse enforcement directive abrogates, interferes with, and infringes upon the State's ability to carry out the sovereign functions of maintaining and operating a judicial system, prosecuting crimes, and carrying out related police powers, raising substantial questions about the balance of power between the federal government and the States. The Immigration and Nationality Act's general grant of civil-arrest authority must be read with this in mind. If Congress intends to "pre-empt the historic powers of the States," it must do so "plain[ly]"—making its intention "unmistakably clear"—in acknowledgment of the fact that "[s]tates retain

substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). Such authorization should not be presumed in the absence of express language, which is not present in the immigration statute.

115. Thus, the Courthouse Enforcement Directive authorizing civil arrests of people in, or traveling to or from, courthouses, and Defendants' practice of carrying out civil arrests against parties, witnesses, and others attending California courts on official business at or near courthouses, exceeds statutory authority and is contrary to law.

116. Accordingly, Plaintiff is entitled to an order and judgment, holding unlawful, vacating, and setting aside the Courthouse Enforcement Directive and enjoining any action taken to enforce or implement it.

## THIRD CAUSE OF ACTION
## Administrative Procedure Act—
## Contrary to Constitutional Right, Power, Privilege, or Immunity
## 5 U.S.C. § 706(2)(B)

117. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

118. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X.

119. The States' judicial and police powers are powers that the Constitution reserves to the States under the Tenth Amendment. *See, e.g.*, *Younger v. Harris*, 401 U.S. 37, 43 (1971). Likewise, "each State's power to prosecute is derived from its own 'inherent sovereignty,' not from the Federal Government." *Heath v. Alabama*, 474 U.S. 82, 89 (1985).

120. The Courthouse Enforcement Directive, and Defendants' implementation of the Directive, interferes with the State's execution of its core

sovereign judicial and police functions by infringing on the State's ability to maintain and operate a judicial system, prosecute crimes, and carry out related police powers.

121. The Courthouse Enforcement Directive is contrary to the constitutional right, power, and privilege of the State and thus in violation of the Administrative Procedure Act.

122. Accordingly, Plaintiff is entitled to an order and judgment, holding unlawful, vacating, and setting aside the Courthouse Enforcement Directive to conduct civil immigration arrests in or near courthouses, and enjoining any action taken to enforce or implement it.

## FOURTH CAUSE OF ACTION

### Violation of the U.S. Constitution—Tenth Amendment

123. Plaintiff incorporates each of the paragraphs of the complaint as if restated fully herein.

124. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X.

125. The Constitution delegated to the federal government "few and defined" powers, while "[t]he powers reserved to the several States . . . extend[ed] to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Gregory*, 501 U.S. at 458 (quoting The Federalist No. 45, pp. 292-93 (C. Rossiter ed. 1961)).

126. "Impermissible interference with state sovereignty is not within the enumerated powers of the National Government." *Bond v. United States*, 564 U.S. 211, 225 (2011). Defendants may not "excessively interfere[] with the functioning of [the] state['s] government[]" without violating the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 932 (1997). The States' judicial, prosecutorial, and

police powers are among the most important powers that the Constitution reserves to the States. *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

127. Defendants have exceeded the enumerated powers of the federal government by impermissibly and excessively infringing on Plaintiff's ability to perform core sovereign functions, including providing a judicial system, enforcing the State's own laws, maintaining public safety, and pursuing criminal prosecutions. The Courthouse Enforcement Directive, and Defendants' practice under the Directive of carrying out immigration enforcement against parties, witnesses, and others attending California courts on official business, unduly interfere with California's administration of justice in California state courts.

128. Defendants' enforcement activities in and around state courthouses deter criminal defendants from appearing and also deter witnesses, would-be litigants and claimants, and others from bringing violations of state law to the attention of law enforcement authorities and the courts. These activities interfere with participation in state court proceedings, and delay and impede the administration of justice.

129. Defendants' Courthouse Enforcement Directive and their immigration enforcement actions excessively interfere with California's sovereignty, in violation of the Tenth Amendment.

130. Further, States have "the power to preserve the property under its control for the use to which it is lawfully dedicated," and "[t]here is little doubt that in some circumstances the Government may ban the entry on to public property that is not a 'public forum' of all persons except those who have legitimate business on the premises." *United States v. Grace*, 461 U.S. 171, 178 (1983). California has and must maintain full proprietary control over state court facilities for reasons that

include ensuring safety, security, and the orderly administration of justice. California has lawfully exercised its right to refrain from assisting with federal immigration authorities in state courthouses where the State exercises control and sovereignty and has lawfully prohibited civil arrests at its courthouses. Defendants' intrusion on state courthouses and their use of the State's property for purposes other than—and in interference with—what the State has determined is the legitimate business of the State's courts impermissibly violate the fundamental rules of federalism and the Tenth Amendment.

131. Defendants' actions violate the Tenth Amendment regardless of motive, but here they have been undertaken, in part, to punish and attempt to coerce California and other states to devote their own resources to carrying out federal immigration enforcement at the request and direction of the U.S. government.

132. Plaintiff is entitled to a declaration that Defendants have impermissibly and excessively infringed on Plaintiff's sovereign powers, in violation of the Tenth Amendment, and an order enjoining Defendants from further unconstitutional conduct.

## PRAYER FOR RELIEF

Wherefore, Plaintiff the State of California requests that the Court enter a judgment in its favor and against Defendants, and grant the following relief:

a. Declare that the Courthouse Enforcement Directive violates the Administrative Procedure Act, as set forth above;

b. Declare that Defendants' actions are in violation of the Tenth Amendment to the United States Constitution;

c. Pursuant to the Administrative Procedure Act, stay, vacate, and set aside Defendants' operative unlawful Courthouse Enforcement Directive relied upon by Defendants to justify civil immigration arrests at courthouses;

d. Enjoin Defendants from implementing, applying, or enforcing their Courthouse Enforcement Directive;

e. Enjoin Defendants from conducting civil immigration arrests at California's courts;

f. Award Plaintiff its reasonable fees, costs and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

g. Award any such additional relief as this Court may deem just and proper.

Dated: October 15, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
ROBIN L. GOLDFADEN
MARISSA MALOUFF
Supervising Deputy Attorneys General
REBEKAH A. FRETZ
EZRA KAUTZ
DENNIS OJOGHO
Deputy Attorneys General

/s/ Theresa Zhen
THERESA ZHEN
Deputy Attorney General
Attorneys for Plaintiff
State of California